I recognize that a large portion of the briefs are highly technical. In the opening brief we tried to really break down some of the technical issues that are addressed and explain them and define them. In addition, there's some technical issues that are addressed in the opening brief. I'm going to give you a couple of examples. One is the Pacific Bell versus California PUC case law. Some of the cases are already cited in our brief, but also Pacific Bell versus California PUC. I have not read these cites to the clerk. Did you write a 28-year letter on these? I did not. I apologize. Did you give the citations to the clerk? I did not, Your Honor. All right. Well, they're very hard to deal with then, but before you leave, would you please give them a list of the citations, both to the courtroom deputy and to your opposing counsel? Yes, Your Honor. There's only one case I was going to cite in addition, which is Pacific Bell versus California PUC 621F3836 from this court in 2010. It sets out some of the analysis of some of the more technical issues regarding interconnection loops, unbundled network elements, and similar issues that arise in this case. That case is not directly on point, which is why it's not cited in the brief, but it does give some good background on those issues. The good faith issue is different. It's not a technical issue. It's an issue regarding prudential exhaustion. This court in the prior appeal held that although there's no statute or regulation requiring parties to exhaust their remedies, their administrative remedies, before bringing a good faith damages claim under the Telecommunications Act, that there are prudential reasons for requiring that. And so this court did remand the case to the district court to determine whether there had been exhaustion of remedies. The problem is, Your Honors, and this is actually addressed in another case that was argued, that I argued a couple months ago in this court, the AutoTel versus AT&T Nevada Pacific, or I'm sorry, Nevada Bell, I believe. Same issue, same problem. The problem is that this Court's ruling basically created a vacuum because there's no Federal or State regulation that I've been able to locate that tells people how to present a good faith damages claim, a good faith claim to the other case. And did you tell us that there was a related case? It's a related – it's not a related case, but it has a related issue. It has this same issue in it? Yes, Your Honors. And you've been here and argued that already? Yes, yes. Okay, and that was AutoTel v. Nevada? It's either called Nevada Bell or AT&T at this point. Has there been an opinion issue? No, Your Honor, no. Was it in this courtroom? I don't think so. I'm trying to remember. It was in San Francisco. All right, okay. And I think it was last – about a month ago. Well, whatever it was, it would have been nice to tell us, but go ahead. Pardon? It would have been nice to tell us, but go ahead. Oh, I see. Okay. The – so there's no State law? My recollection, having written the earlier opinion and having read it again, is that there was a fairly developed discussion of why there was a good reason to think that this could go to the agency and how. There were pretty good clues in there about how to go do it, yes? Well, there's – it tells us that we need to do it. And also some notion about why and how. Well, the problem is that when you file with the State PUC, you look to their statutes as to how to go about doing that. You look to their statutes and regulations. When you go to the statutes and regulations, it tells you what to put into a petition for arbitration. It tells you what to put into a complaint about – But in this case, your actual complaint, your good faith complaint, at least at the time of the last case, was essentially they did – they – I'm sorry. It was essentially they did not negotiate. It wasn't – on what the arbitrator decided. It wasn't that the basic complaint at that point. That's one – that's part of the complaint. At the time, then. Were you the lawyer at the time? Well, I've never been the lawyer in the PUC except very recently. In the earlier lawsuit. In the earlier version of this appeal. Were you a lawyer then? Yes, yes, I was. Yes. And my recollection, and what's reflected in the opinion, is that that was the good faith question. It seems to have been expanded now, but at that point, that was essentially what it was. Yes, and the district court in this case looked at the record and decided on remand that we did not exhaust administrative remedies. And I would disagree with that point. Well, when you're disagreeing with it, Let's get back to Judge Brisson's question for a moment, because there was some frustration in the court on the last opinion that it wasn't clear what your bad faith claim was, whether it was based on negotiations preceding the arbitration, whether it was based on the arbitrator's result, whether it was based on something else. And there was some considerable frustration. In a sentence, can you answer that question for us today? Can you say precisely what bad faith you think occurred? Yes, Your Honor. The complaint that my client Pro Se filed with the PUC back in, I believe, 2005, before this Court issued its ruling on appeal, is in the record at ER 60 to 61. And that complaint says, and that's the initial document with the PUC, says that Quest has refused to negotiate in good faith. Wasn't that about a completely different thing? Wasn't that about this letter that they claimed was reopening the contract? Pardon? Wasn't that about a completely different matter, i.e., whether there was a reopening of the contract that required new negotiations? Yes, it was. My client is seeking damages for failure to negotiate in good faith before he filed with the PUC. All right. It was not this 2005 document. Maybe I'm confused. But I thought the 2005 document was referred to a 2005 dispute about a letter that Quest wrote that your client claimed was a reopening of this agreement. Am I wrong about that? That's correct. And that happened before filing with the PUC, yes. I'm sorry for being confused. But it was not about entering into the agreement that we're now litigating. It was about something else. No, that's not correct. Because what happened was, and I realize this is very convoluted. In 2005, the parties had been negotiating on and off and trying to come to some sort of agreement. About what? About an interconnection agreement. An interconnection agreement, the one that we're now looking at. Another one. And that proceeded for four years with no requests for arbitration and no definitive complaints. It just kind of petered out. So why should we even go back and worry about that? Because there's very strict time limits on when you have to do things. And nothing happened. It just kind of was ephemeral. I mean, vague stuff. Well, even if you just look at what happened in 2005, which is that Quest sent out to 180 small carriers this kind of form letter saying, we are requesting negotiation of an ICA with you, small carriers. And then Western Radio said, well, let's take this to arbitration. And that's what led to this dispute today. And that's the damages that we're seeking today. But it's not what led to this dispute today. This is getting more and more complicated and off track. It has nothing to do with what led to the dispute today, as I understand it. I thought what led to the dispute today is that we're still talking about the earlier set of negotiations and arbitration and the ICA that was entered into as a result of it. Am I wrong about that? I thought that this 2005 episode just kind of ended because the PUC said they don't have any obligation to negotiate about that. They're still the old ICA and this doesn't apply to you. And that was the end of it. The damages from the failure to negotiate and the damages stemming from that have been ongoing. And it may well be that some of them are too old to address in the courts. But this case, this 2005 letter that Quest wrote to 100 and whatever it was, small companies, has nothing to do with this case, does it? It does because that is when the time period to reopen, to re-request arbitration opened. When Quest ---- A PUC said it didn't. And that's not my understanding of what this case is about. I thought this case is about the ICA agreement that was entered into as a result of the earlier set of negotiations and arbitrations and nothing else. It would be very helpful to talk about this case. Yes. And that's what the PUC said, too. When you file the subsequent request, they said, well, we've already issued that opinion. That chapter has been closed. And you can't open a new chapter without going through the very precise time frame of requests and negotiations. The PUC did not issue an order approving the ICA in this case until October 2005. So at the time Western Radio filed its complaint and its request for arbitration and its complaint about good faith, failure to negotiate in good faith, there was no ICA in place. It was just sitting there in limbo, and it had never been issued by the PUC. There were negotiations, and there was an arbitration agreement, and there was a contract submitted, and there was then a lawsuit filed here. And I don't ‑‑ I think that we're just perhaps wasting time to be arguing about that particular what seemed to me to be a completely separate set of events that just never led anyplace. Maybe we could change subjects as soon as everybody is satisfied about that and to focus on your challenge to the interchange agreement itself. What do you think is the biggest error in the approval of the ICA? There are two major errors. The major ‑‑ the biggest error is that the court ‑‑ I'm sorry, the PUC and then the court refused to acknowledge or address the fact that the burden is on the incumbent to show that the requested interconnection is not technically feasible. If it is technically feasible, it is supposed to be incorporated into the interconnection agreement if that is an open issue presented to the PUC. And here on several points ‑‑ Which issue is that? Is that the issue that's overriding all of it? It does ‑‑ Or is that focused in issue three, or what are you really talking about? It does run through most, if not all, of the issues. And the second major issue is closely interrelated, which is that the PUC chose to allow Quest to defer much of the negotiation to the future in the so‑called special request process, excuse me, special request process. And what's wrong with that? Because you might win that. It seems to me that a whole lot of those issues, the word popped up in my mind about whether it's right, because we don't know that the PUC might not agree with you. Well, the PUC didn't agree with us because ‑‑ Well, because they said you ‑‑ this is still subject to further negotiations and is still subject to PUC approval. And you said, no, wait a minute, we want it all resolved now today. And PUC says, well, these are complicated things. And, I mean, on several of the rulings, I'm not even sure you've got a ripe claim at this point. Well, the Telecommunications Act has very, very stringent deadlines. And one of those deadlines is a deadline on the PUC to make a final decision. And the final decision, in the final decision, the PUC is required to address all open issues. For example, there's this question about whether you can interconnect with what the other side is calling antiquated technology. And I don't know if ‑‑ but you didn't say, as I understand it, we want to interconnect at this particular location with X kind of technology, right? In other words, how could it be decided until you knew exactly what it is you wanted to do where? And then, to supplement that question, and you would know what the costs are going to be and how you're going to allocate those costs. That's the whole point of negotiating an interconnection agreement. The parties worked hard to reach agreement on ‑‑ Could you come in and say at X, I don't know what you call them, access point, we want to do a digital connection rather than a whatever. What's the current kind of connection called? Entrance facility? No, what do you call the technology? Oh. Well, whatever it is. You want X kind of technology that isn't generally being used. We want this kind of technology and we want it at X place. Did you ever say that? Well, I'm not sure if in this record it tells us whether there were specific points noted, but that's not what's required in an ICA. An ICA says, here is an agreement as to how we are going to allow interconnection in general throughout our network, and that's what's required by the statute 251. How could that determination be made if we don't know exactly what you want where? Why isn't it more sensible to say, okay, when you come in and tell us exactly what you want where, we will then negotiate about it? I mean, how else can you do it? That's not an issue that Quest raised. Quest did not say, gee, until you tell us the exact location, we can't determine whether this is technically feasible. Instead, they said, per se, we are not going to allow interconnection based on this what they called outmoded technology. No, they didn't. They said, unless you come with a special requestion, we won't negotiate. Well, but the special request process is, by definition, outside of the negotiated interconnection agreement. The whole point of an interconnection agreement is to say, once and for all, for this period of time, these parties are going to interconnect as contemplated by the Act, and here are the provisions that will govern that. There will be reciprocal compensation for local areas, as that's defined. So the point you're saying is that everything, you think that everything has to be settled in the Interconnect. You don't defer anything for later PC approval. And do you have case law that supports that? I don't know of another case where this process has been used where open issues are kept open. Why couldn't they? Tell us what in the statute prohibits that. I mean, it seems eminently sensible with all the complexities where many times the quest is saying we'll figure out the price, we'll figure out if we've got feasibility on this dial tone stuff, the DTMF and the dial pulse, so places we could put you in, places we can't. That's not what they argued, Your Honor. With due respect, they argued that as a matter of just across the board, we are not going to allow this type of interconnection in our negotiated agreement. I thought the agreement, the way I remember the agreement, there was no piece of language that says that if it's technically feasible, we'll talk to you about it. Well, yes, but that puts the cart before the horse. The burden is on the ILEC when a request is made to have an interconnection agreement. The burden is on the ILEC to say this is not technically feasible, what you're proposing. See, I'm beginning to see this case because of your argument a little differently now. I think what you're saying is that everything needs to be worked out in this agreement and that if it's not all worked out, it's defective. And I'm just curious, if we look at other interconnect agreements around the country, are we going to find support for your position? If you look at any interconnection agreement, including the one that was adopted by the PUC in this case, you'll see that they speak in broad terms and allow for interconnection at reciprocal rates with the terms defined in the interconnection agreement as to when and how that can occur. And can the when and how include further negotiations, and can it include subsequent PUC approval? I'm not aware of another case that has addressed that. Either pro or con, either for you or against you? No, I don't think that that's been the norm. You know, as complicated as these agreements are, it's quite an extraordinary position for you to take that every single thing has to be resolved in one agreement or the agreement is defective. Well, not every single thing. The parties often can agree that certain things will be kept open, but issues that can be decided once and for all, which, for example, do we have to connect at every single tandem point, or as this Court said in Jennings, can we connect at a single tandem point and then you, Quest, are required to take our traffic throughout your network. That's a really straightforward issue. I have a question about that issue. First of all, the cases like Jennings were talking about a single point per ladder. Now, whether that was fortuitous because that's what was being requested or whether it was purposeful, I couldn't tell. But your argument, as I understand it, is that it was not – maybe that's all that was being asked for there, but that the statute does require that there be one per network, meaning not just per ladder. Is that right? Is that what your argument is? Correct, Your Honor. The statute uses the term network, not ladder. A network would be all over? I don't know what – I think it's within the state. It doesn't go outside the state. Now, what – presumably their answer is we don't do it that way, not that it's not technically feasible. Would – if there were a cost in doing it – in other words, it's your position. They have to let us do it, but they can charge us. Is that your position? Well, they can charge, but reciprocal compensation kicks in because when that happens, there are customers of Quest that are going to have their traffic transported on Western's lines to Western's. But if it overall costs Quest more? Actually, the parties agreed to what's called bill and keep, agreeing that to figure out every little bit of compensation is way too complicated. Your position is that even if this would require a reconfiguration of their network because it isn't the way they do things, and even if that costs them money, they'd have to do it. Is that your – I'm just trying to clarify the position, because frankly it sounds a lot more plausible to me if it's – they have to let us do it if it's technically feasible but they can charge us versus they have to let us do it if it's technically feasible and they can't charge us. Well, the – I see my time is up. Can I answer your question? The overall charges that a carrier has are brought to the PUC in rate making proceedings, and they get to, you know, to cost out the price of doing business and changing their technology and so on. But the general practice in interconnection agreements is to have what's called bill and keep reciprocal compensation, and that's part of the whole basis of the change in the telecommunications. So essentially your position is they had to do it and not charge you. That's correct. If you read Jennings, it explains that even if it's a novel use of the technology or requires some modification, there has to be interconnection unless it's technically infeasible. Okay. Thank you very much. Thank you, Ernest. We'll give you some time in a moment. Thank you. Thank you. Thank you. I'm Gregory Monson. I represent Quest. I'm going to take about 12 minutes, 12 to 13 minutes, and then Mr. Wyrick, who represents the Oregon Commission, will take the balance of the time. If any questions arise during his argument, he might try to save me a minute or so to answer them. I think we ought to start with the good faith claim because that's what the questions were mostly about. The point is, and I think you hit the nail on the head, Western Radio still hasn't decided where Quest failed to negotiate in good faith. It raised in its complaint, in its supplemental complaint, which is on appeal in this case, it said that the thing Quest failed to do was that it failed to complete an interconnection agreement that complied with the commission's order in the first arbitration and that it didn't file it quickly enough with, didn't provide it quickly enough to Western Radio. Well, as you noted in the earlier decision, it was Western Radio's obligation to prepare the agreement compliant with the order under the Oregon Commission's rules, and Western Radio didn't do that. So Quest went ahead and did it, sent it to Western Radio, and Western Radio basically said... But that's not the issue. Yeah, it's not. Was it exhaustion? Yeah. Pardon? The issue at this point was did they bring that complaint to the agency? Could they, did they, and did the agency decide? Right. And I'm getting to that point. The point is when Quest sent the agreement to Western Radio, and Western Radio said, well, I don't have time to look at it right now, I'll look at it later, and then Western Radio looked at it and said, we don't think it complies with the agreement, they didn't bring that complaint to the Oregon Commission. I mean, the question was how do you bring a good faith negotiation claim to the commission? Well, it's pretty obvious to me if someone sends you an interconnection agreement that you don't think complies with the order of the commission, you tell the commission it doesn't comply with the order. But Western Radio didn't do that and never did that. That's what the earlier opinion said. The earlier opinion specifically said that. Go tell the commission if you don't like this. Right. And then they tried to tell the commission after the interconnect was approved, and the commission says it's too late. So do you think there is any question about exhaustion at this point or potential exhaustion? The court has held, the court held earlier, the district court held earlier, that they had not raised that claim prior to the arbitration decision. They didn't raise the claim after the arbitration decision. There's no question that they have not complied with the requirement of prudential exhaustion. And am I correct that when they did raise it, or there were some words about good faith, that pertained to this other issue about the 2005 letter that really has nothing to do with the case before us now? Which is a separate interconnection agreement. Right. It's totally new. What they did is they filed an arbitration petition four days after the commission issued its order approving the interconnection agreement that's at issue on this appeal. Four days after that, they filed a petition seeking arbitration of a different and a new interconnection agreement. There is some confusion, or at least there was confusion in the way it was presented, whether that related to the earlier agreement or the new one. But in either case, they wouldn't have exhaustion. Because the court, the PUC said, I'm sorry, we're not going to look at this as far as the old one is concerned, and you haven't met the time framework to present a new one at this point. The commission said, the commission dismissed that second arbitration petition because it was an attempt to end run the decision that had just been issued four days earlier. It didn't address the claim. See, I'm confused now. If that is the problem, then why wasn't that, in fact, relating to the interconnection agreement that is before us now? The commission thought that that's what they were trying to do, apparently. What happened was Western Radio didn't like the arbitration decision of the commission. The one that was before us previously. Yes. They didn't like that decision. Rather than waiting for the commission to approve an interconnection agreement, which is what you're supposed to do, whether you like the decision or not, you're supposed to sign the interconnection agreement, and then you submit it to the commission, or you tell the commission that the agreement that was tendered by the other party doesn't comply. Anyway, they filed an appeal instead of doing that, which is an unusual process and one that normally doesn't take place. After they did that, then the appeal took place to the district court. The district court ruled that it was premature, and at that point Quest notified the commission that the district court had ruled and asked them to go ahead and approve the interconnection agreement that had been submitted if the commission found it compliant with its decision. So the commission reviewed that, decided it was compliant, and approved it. In the meantime, the appeal took place to this court, and there was a reversal and remand to determine whether or not Western Radio had ever raised before the commission the question of good-faith negotiations. On remand. Was the request that was filed four days after the interconnect was approved, did it purport to pertain to the earlier interconnect agreement, or did it raise a totally different challenge? It raised a totally different agreement. And on its face, it didn't purport to include the interconnect agreement that's before us today in any way? The claim that was made in connection with the second arbitration was that Quest had refused to negotiate an interconnection agreement after sending the May 2005 letter, a new interconnection agreement. All right. Can we go to some other? So really it had nothing to do with the prior stuff that the commission had to do? That's right. That's correct. So can we discuss a couple of the technical issues while the time is running? Yes. Yeah, I'd be happy to. I guess the ones that interest me are the basic question of the application of the Jennings case to the request to a single interconnect. And also I came across a couple of cases that weren't in the briefs that have to do with the question of whether, for CMRS's cases, calls routed through interstate connections, in fact, are subject to reciprocal compensation or not. There's an Eighth Circuit and a Tenth Circuit case. Do you know about those? Alma and Atlas Telephone, which are not in the briefs, which I don't know why they're not in the briefs. Maybe you can tell us that and why we ought not follow them. My understanding of what they hold is that, in fact, for CMRS's, the fact that it's routed through an interstate carrier doesn't matter. I can explain to you why I didn't put them in the brief, those two cases. I'm aware of those two cases. Those cases were cases in which the CMRS provider was not interconnected directly with the rural telephone company. It was an ILEC, but it was a rural telephone ILEC, and there was actually a whole group of them. And there was no direct connection. So the only way traffic could come from the CMRS provider to the rural telephone company was through an IXC, an inter-exchange carrier. In that case, the inter-exchange carrier was not acting in the normal way that an inter-exchange carrier works, which is when you place a long-distance call, you have pre-selected an inter-exchange carrier. You may not know you have, but you have. And that call is routed to that carrier. You pay a fee to that carrier, and that carrier then completes the call and pays access charges to the originating and the terminating local carriers. But in the two cases you mentioned, the inter-exchange carrier was simply routing the traffic from the CMRS provider to the local telephone company. Well, I thought that's what I couldn't understand about the issue here. I mean, I thought we were talking about local calls that happened to go through an IXC just because that's the way the networks happened to be set up, but there was no reason. It wasn't because the customers were trying to make an interstate call. Is that right? No. What we're talking about in this case is exactly where the customer is trying to make a long-distance call. They don't have to be interstate. They can just be they're just long-distance calls between ladders or something like that. But I thought the whole point was that it was calls from one local to another local within the same local area that was routed through an IXC. Is that not correct? I thought that's what we're talking about. Cases that calls that are local calls but were routed through an IXC. No, a local call wouldn't be routed to an IXC except in the cases you mentioned because in those cases the IXC was the only way to get the call to the local telephone company. So what's the point of that? I don't understand it. I mean, I thought everybody agrees that if it goes through, that if it's a long, quote, long-distance call, then it's dealt with on an access basis. But I thought this was a special species of calls that appear to be local calls. I'm wrong about that, you're telling me? If Western directs a call to Quest or Quest directs a call to Western within the MTA, that is subject to reciprocal compensation. There's no dispute about that, and that's what the agreement provides. All right. So it's only when the customer directs a call to a long-distance carrier. And in that case, Western says it's concerned it will have to pay access charges to Quest, but Western won't pay access charges to Quest. The inter-exchange carrier will pay access charges to Quest. But where will they get the money? They get the money from their customer, who directed the call to them. Okay. All right. Well, I'll ask about that, but my understanding was otherwise, because I thought that there was no dispute about that. The problem was when you had a local-to-local call that ended up going through an interstate. All right. So let's leave that aside, because that's your understanding. That's what does happen in those other two cases. Well, I understand that, but I thought that's what was happening here, too. No. If I could, I'd like to talk about Issue 3 that has to deal with the district court. It seems to me that under the statute 47 U.S.C. 251C, that Western is entitled to connectivity with the existing incumbent network that is technically feasible, which everybody agrees it's technically feasible, at least equal in quality to that provided by Quest to itself or its subsidiary affiliate or other party to which the carrier provides interconnection, and then 3, which nobody's fighting about. What worries me is that it seems to me that the district court is suggesting by its decision and relying on a decision, frankly, which has been now undone by the Fourth Circuit, that Quest can demand that they have the quality of, if you will, service or quality of interconnection that they would provide. But it seems to me that the statute would suggest you've got to provide it whether it meets your quality or not, which it seems to me is what the Fourth Circuit said when it overruled Verizon. Right. The problem you have is this. Just because something is technically feasible doesn't mean it's available in the network. And the evidence was undisputed that dial-tone, dial-pulse signaling and DTMF signaling are outmoded technologies. Now, the agreement that was reached... Outmoded but nonetheless used by Quest, as I understand it, and some of its other affiliates. So says the district court. Not in switching calls. Not in calls between switches. But the agreement provided that if it is available, Quest will provide it. And Quest agreed to that. And this relates also to the issue that I mentioned. In both instances, the statute says technically feasible. It doesn't say available. So why isn't they — why aren't they right, both with regard to this outmoded technology issue and also with respect to the single interconnect issue? And I understand your time is up, but please answer the questions and we'll give your colleagues more time. Why aren't they right that the statute says technically feasible? And that may lead to issues about cost allocation. But why should it lead — why isn't the statute governed in both instances to say if it's technically feasible, you have to do it, the cost we can deal with separately? I can give you a quick example that I think illustrates what the problem is. Oh, I want a statutory answer. I understand it's inconvenient, you don't want to do it. No. It's problems and so on. But what's the statutory answer? And I'm agreeing with my colleague on this because I tried to go through and I appreciate that the district court relied on Verizon. But when I read what the Fourth Circuit did with Verizon, it seems to me, again, Quest has to provide this service as long as it's providing to anybody else. And Quest is going to provide it if it's providing it to another carrier. Well, that isn't exactly what you argued or what the district court found. But with regard to the statute and the rule, the FCC made it quite clear in the first reporting order and in the uni remand order that Quest isn't required to rebuild its network or to engage in extensive costly changes to its network to accommodate the needs of one carrier. So there's two questions. There's technical feasibility, and Quest never disputed that it was technically feasible. But there's also a question of is it reasonable in the context of Quest Network to have to provide outmoded signaling systems and to keep them in place just because one small carrier wants them. And the answer that was a sensible answer that the commission came up with was provide them where they're available. If they're not available, you don't have to provide them. It may be sensible, but I guess this leads to a larger question. I mean, perfectly sensible, but it may the statute says technically feasible. Now, does the negotiation and arbitration system lead to the conclusion that the arbitrator can make decisions as to an agreement that isn't required by the statute but just makes a lot more economic sense, for example? Is that basically what you're saying? No. It just makes sense and we should be able to do it? No. The way you deal with the economic issue is if the competitor imposes costs, as the court said in Jennings, then the competitor should bear those costs. That's not what this agreement says. That's, I think, what we're both pointing to. You could have had an agreement that said, yes, you can do it, and we'll have an independent auditor decide the costs. Now, I understand this is why I asked them what I asked them. Their position seems to be, no, you bear the costs, but that's a separate issue. Your argument seems to be you don't have to do it, and this agreement seems to say you don't have to do it if it's not available. Not you have to do it, but you can charge them whatever it costs. Well, it's – I mean, I'll give you an example. In the old days, an operator used to plug in lines for switches between two calls. Remember? You don't remember this, but you've seen it. We do remember. But you gave a signal, and you called the operator, and you said, I want to call so-and-so. He told us all about that. They plugged the lines together. That's still technically feasible, but do you really believe the Act would require a quest to reinstall manual switchboards if that's the way you want it? I don't know. Do I really believe it? I read the statute. It says technically feasible. That's what it says. So the question is, can the agreement go beyond that because we're trying to do something sensible or not? Yes. In a short answer, yes. The Commission can make reasonable decisions based upon what's current technology in the network. So you would say that that statute was technically feasible. You would say it really means technically and economically feasible. No. No, it doesn't mean economically feasible, but it could mean technologically feasible, sensible. Maybe we're getting hung up on what the definition of technically feasible means. All of this still gets me hung up on whether it's right because on most of these things, Quest said, we'll talk to you about whether we've got it available anywhere in our network. If we do, you can use it. Or in the term of the dial tones, they were saying if it's accessible to other people, you can use it. And then in other cases, they said, we'll do it if you'll pay. We'll have to let the PUC decide whether to pay. And what Radio is saying is, no, we don't want all of those things deferred. We want them resolved now. So I'm wondering on a rightness issue if all this stuff is really right yet. But they say, yes, it is right because the interconnect agreement's purpose is to get everything resolved in one big package. Is that right? You can't resolve everything in the interconnection agreement because there's going to be situations arise where the parties have to get together and negotiate what they're going to do. Meet point arrangements is one of those and other issues. I feel like I better let Mr. Weirich speak. Thank you very much. Thank you very much. We'll give you about five minutes. Good morning, Mike Weirich for the PUC. There isn't much left for me to talk about, I don't think. I kind of agree with everything you said, so we can stop there. Well, can you answer my question? Well, I don't know about that, but can you answer my question about the Alma and Atlas cases and what is in fact going on in this agreement? I thought, am I wrong in thinking that the dispute in this agreement was about calls that are routed through an IXC but are local calls? From one local person to another local person and they're routed through IXCs because that's just the way the routing is going. Is that not right? That's my understanding. Your colleague was wrong. I would like to defer my colleague who knows the technology much better than I do. It's not a question of technology. It's a question of what the dispute was in this case. That's what I thought it was about. So in that case, why aren't these two other cases pertinent? I have to defer on those cases. I'm sorry. I'm not up to speed on those cases. Okay. All right. Then the other question is the one that Judge Smith and Abed and I have been asking about that are related. That is, if something is technically feasible, the quote out loud of technologies and or the single interconnect through the whole network, why doesn't the statute govern that and all these questions about reasonableness and sensibility and so on are cost issues? My understanding of this case is Quest is not disputing any of the matters that have been raised by Western Radio as being not technically feasible. They agree that they are. They're saying we don't have to do them. I don't – again, I don't – I think Quest and I are saying the same thing, but I don't hear them saying they're not going to do them. Certainly on the single interconnect, they're saying we're not going to do it. What I hear them saying is if it causes them to incur significant costs to reconfigure their network, Jennings would allow them to recover those costs. The agreement says no. It says you're not going to do it. It doesn't say you can do it, but Quest can charge you. In this case, the costs were so significant, I think, that the end result was, I think, the operator would plug in the two lines and if it's such a significant cost, I think in the end the answer is it's technically feasible, but the costs are so significant, which Jennings would allow, that it doesn't make sense for it to happen. Is that what you're saying as to Issue 3? Issue 3 was the dial pulse. Yeah. What I understood with Issue 3, actually I was here to talk about the good faith claim, but I'm happy to take these on. Well, I mean, my worry about Issue 3 is that if it's technically feasible, it seems like somebody has to do it, whether they like it or whether they don't. They don't have to give, if I read the statute very carefully, they don't have to give the best. They don't have to give the best that has to be, but as long as it's technically feasible, they have to give at least equal in quality to that provided, or they can give less than what's equal in quality as long as it's technically feasible. What I understood about Issue 3, I think we're agreeing, it was outmoded, nonstandard technology. It's outmoded and nonstandard, except that right in the record the district court says, and I agree, the unusual situations where Quest does offer interconnection is where, one, the customer is already willingly, already utilizing them and was grandfathered, and two, the existing facilities providing these types of signalings were already available, and so therefore Quest is using the very same stuff that they want them to use to interconnect. Why not then make them interconnect, whether they like it or not? I think Quest was saying, and the PUC agreed with this, and the district court as well, is where it's available, we will allow you to connect, just like how we're using it. Where it's not available, that's where we use the special request process. You said you wanted to talk about good faith. I'm through. So why don't you talk about good faith? Oh, I'm here to clarify any confusion. I totally agree with what I think the court's understanding is. The matter that was under consideration the first time around was known as ARB 537. There was a commission order issued in ARB 537. You remanded to have a look at whether the agency considered it had been raised, the good faith claim had been raised in ARB 537, and whether it had been dealt with by the PUC. I think Western has admitted it was never raised in ARB 537. So I think that much is done. So that was the case that was under consideration the last time around. The PUC was not presented with that claim. It was never raised, and the PUC never considered it. The other case that you've been discussing was known as ARB 706. That's the one where Western came around four days after ARB 537 order had been issued, wanted to do an end run, whatever you want to call what they were doing. They took this letter from Quest and said they wanted to reopen negotiations. The PUC in ARB 706 said we consider this to be a separate case. It's not a continuation. It's not a second phase of ARB 537. You can't come here four days after the other order has been issued. It's in effect for three years. This is improper and inappropriately filed and dismissed. Okay, thank you very much. All right, thank you very much. On the good faith claim, I think there is some confusion. Number one, it's clear the record was not developed because this case was dismissed on a 12b6, and so we don't know what the nature of the good faith, how far back the claim goes, for example. But this was a good faith. Who had the burden of proof? When we remanded, didn't you have the burden of proof to tell us? Good faith was raised before and identify where it was raised. Well, it was clearly raised. The problem is you had the burden to tell us. So you're saying now, well, it's agnostic. We don't know. It went back a long time. But on the remand, it was clear that if it went back a long time, you had the burden to explain to us and cite to us in the record where it was raised. And we did that. The problem is because the PUC dismissed it summarily without testimony and then the testimony, there is no record that tells us what the nature of the good faith claim is. But we do know one thing. It is not ‑‑ it is separate from a request for arbitration of an interconnection agreement, and this Court's prior decision did not say that a good faith claim for damages can only be brought to the PUC in the context of an arbitration request. So Mr. Oberdorfer, on his own pro se, tries to present a good faith claim separate from a request for arbitration in the 706 arbitration. It's called an arbitration, but it's a request for good faith damages. And it's thrown out summarily. And there's no procedure that we have been able to determine to avoid that happening. And although there's no provision for asking for damages from the PUC, Mr. Oberdorfer of Western Radio did ask for rates and terms to remedy it. That's in the record at 60 to 61. And so we never had the opportunity to develop the record as to what this claim is. And just real briefly on ‑‑ My question about the local calls going through IXC. Well, I think on that one, it's important to understand that 47 CFR 51.701B2 defines the local traffic between an ILEC and a CMRS as being within the major trading area, and that's different from non-CMRS traffic, which allows the state to define the local area. There is no evidence in the record that the calls in question would go outside of the metropolitan major trading area that I know of. Sorry, major trading area. And the agreement doesn't define what the local area is. It says that it's going to be the local area defined by the PUC, which is the rule for non-CMRS traffic. And so that's one of the issues, and issue two, that's a problem with the ICA. I am out of time, and I appreciate you giving me extra time. Thank you. Thank both of you, all of you, for useful arguments in a difficult case. The case of Western Radio Services v. Quest is submitted. We will go on to ‑‑ why don't we take a break? Can we do that? And then come back. Can we take a short break? And then we'll come back, because we have gym breaks. Okay. Thank you. Thank you. Thank you. Thank you.
judges: Ebel, Berzon, Smith